Filed 8/19/14  P. v. Ramos CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ELIAS RAMOS,<br><br>    Defendant and Appellant. | F066726<br><br>(Super. Ct. No. VCF255603)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Brett R. Alldredge, Judge.

Stephen Gilbert, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Leanne LeMon and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found defendant Elias Ramos guilty of first degree murder (Pen. Code,[1] §§ 187, subd. (a), 189) and found true the special allegation that he personally and intentionally discharged a firearm in the commission of the offense (§ 12022.53, subd. (d)). He was sentenced to 50 years to life in state prison.

On appeal, Ramos contends: (1) the video recording of his police interview was inadmissible because the interview continued after he invoked his *Miranda*[2] rights; (2) it was also inadmissible because his confession was the product of an impermissibly coercive interrogation process; (3) the trial court erred by excluding evidence of the victim's prior felony conviction offered to impeach the victim's hearsay statements; (4) the trial court erred by refusing to give CALCRIM No. 3400, the jury instruction on alibis; (5) the sentencing enhancement under section 12022.53, subdivision (d), must be struck because the jury was not instructed that the discharge of a firearm must have "resulted in death or great bodily injury"; and (6) the victim's hearsay statements identifying Ramos as the person who shot him were inadmissible under *Crawford*.[3]

We affirm.

### FACTS AND PROCEDURAL HISTORY

Around 5:50 a.m. on July 25, 2011, Tulare County Sheriff's officers were dispatched to a residence on Avenue 296 in Exeter on a report of a shooting. Detective Neil Skrinde, the first responder to the residence, arrived at 6:12 a.m. and found Federico Acuna lying on the ground on the threshold of the front door of the house. A woman was holding a towel on his chest; the towel was soaked with blood. Acuna was alive, but he was having trouble speaking. Soon after Skrinde arrived, emergency medical personnel

---

[1]  All further statutory references are to the Penal Code unless otherwise noted.

[2]  *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[3]  *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).

2.

arrived and took Acuna to the hospital. Acuna later died from a single shotgun wound to the chest.

The shooting occurred in front of the home of Debra Ward. Acuna, who was known by the nickname Pee Wee, had been staying at Ward's house for about five months. Acuna worked for Alberto Ramos doing field work. Ward saw Acuna early that morning, and he appeared happy to be going to work as he had not worked for a couple of weeks. Ward knew that Alberto[4] was out of the state working, but she understood that Acuna was going to be working with Alberto's son.

Ward heard the door shut when Acuna left the house. Then she heard two "loud bangs" and heard Acuna screaming. Acuna was outside yelling, "Help me, I have been shot." Acuna made it to the front door and lay down in the middle of the doorway. Acuna kept saying, "My boss's son shot me" and "It hurts." He asked if he was going to die.

Ward's son, Tyler Gorman, was also staying at Ward's house on July 25, 2011. Gorman saw Acuna open the front door and leave the house. About five or 10 minutes later, Gorman heard two shots and then Acuna was at the front door holding his chest. Gorman called 911 and gave the phone to Ward.

The 911 dispatcher asked who shot the victim, and Ward told her, "His boss's son." The dispatcher asked a series of questions. Ward relayed them to Acuna and gave his answers to the dispatcher. Ward said Acuna's boss's name was Alberto Ramos and he lived in Lindsay. There had been a blue van and no one other than the shooter was in the van. The dispatcher asked for the boss's son's name, and Acuna said "Elias."

A neighbor staying on Avenue 296 reported that he was awakened that morning by the sound of a "van with loud pipes." He looked out the window and saw a van

---

**4** We refer to Ramos's relatives by their first names for clarity and brevity. No disrespect is intended.

backing up in the driveway. The van was gray and had an Oregon license plate. About 15 to 30 minutes after he first heard the van, he heard it again. He heard a horn and then a gunshot. He looked out and saw the van driving off at a high rate of speed.[5]

Ramos lived in Lindsay with his parents, Alberto and Florencia Ramos, and his brother, Jesus Ramos. They lived on a large rural property with a mobile home, a few small trailers, farm equipment, and several vehicles. The same day as the shooting, the sheriff's department conducted a search of the property. Ramos was home at the time of the search, and detective Frank Zaragoza asked Ramos his name. Ramos spontaneously blurted out that he worked for the water district and he had been at work that morning. Ramos further asked why "don't [the officers] just take him out to the field and shoot him in the head because the Sheriff's Department has a habit of murdering people." Ramos was taken to the sheriff's office for an interview.

Detective Jose Torres interviewed Jesus, who also was home during the search. Jesus told Torres he woke up around 5:00 a.m. that morning and noticed his brother was leaving in the family's older model, gray Chevy van. When Jesus was cooking breakfast at 8:00 a.m., Ramos showed up at home again and asked for some breakfast.[6]

Zaragoza and deputy Daniel Baker conducted the interview of Ramos. The interview lasted four and one-half hours and was videotaped. Ramos told the detectives he woke up very early that morning, although he did not check the time. He went to work at his boss's house, which was about 20 miles away from his house, to do irrigating. Ramos said he used a van to get to work and he "always use[s] the van." Zaragoza asked

---

[5]    At trial, the neighbor identified a van that belonged to the Ramos family as the van he saw that morning.

[6]    At trial, Jesus agreed that he told Torres he saw Ramos leave their property at 5:00 a.m., but denied that he told Torres that Ramos was driving a van. Jesus further testified that, in fact, he had not seen Ramos leave their property that day. Jesus testified that Ramos was home when Jesus woke up that morning.

4.

if he picked anybody up for work, and Ramos said he went to pick up his dad's worker, Pee Wee.**7** Ramos said Acuna was not ready, so he left. Zaragoza told Ramos that Acuna ended up at the hospital and Acuna said Ramos did something to him. Ramos responded, "Yeah, I know," but denied that he did anything.

Later in the interview, Ramos admitted that he had been armed with a shotgun when he went to pick up Acuna. He told the detectives it was a long barrel, one shot shotgun and he put it in a white van under the backseat. Ramos admitted he shot Acuna but, at first, said it was an accident. Zaragoza asked where the van he drove was registered, and Ramos said Oregon. Toward the end of the interview, Ramos admitted that he grabbed the shotgun, loaded it, and pulled the trigger. Ramos said it was a 20-gauge shotgun. Zaragoza asked why he shot Acuna, and Ramos responded, "I shot him alright, I shot him, me, with my own hands, I just shot him."

Deputy Barry Molyneux found a 20-gauge single shot shotgun with an expended shotgun shell on the Ramoses' property in a white GMC van. The shotgun was underneath a bench seat in the passenger compartment of the van. Molyneux asked Jesus if he had ever seen the shotgun before, and Jesus said that it was his grandfather's. Jesus said it had been several days since he last saw the shotgun. According to Molyneux, Jesus told him the shotgun was normally kept in Ramos's room.**8** A criminalist later tested the shotgun at various distances and determined from the shot pattern on the victim that he was shot from a distance of less than five feet.

---

**7** Ramos referred to Acuna as Pee Wee throughout the interview. We also note that Ramos mentioned Acuna's name without prompting from the detectives. Zaragoza asked whether Ramos picked up "a co-worker or something like that," but did not ask specifically about Acuna by name.

**8** At trial, Jesus identified the 20-gauge shotgun found in the white van as the family's shotgun. He testified that the shotgun was sometimes kept in his bedroom. Jesus, however, denied that he told anyone the shotgun was kept in Ramos's bedroom.

The Tulare County District Attorney filed a first amended information against Ramos charging him with murder. (§ 187, subd. (a).) It was further alleged that Ramos personally and intentionally used and discharged a firearm, which proximately caused injury and death. (§§ 12022.53, subds. (b)-(d), 12022.5, subd. (a).)

A jury trial began on January 7, 2013. The People played an audio recording of Gorman's 911 call and showed a video recording of Ramos's four and one-half hour police interview.[9]

Zaragoza testified about techniques he uses when interviewing a suspect. He explained: "I basically use what I consider to be a technique that works for me and it is what is being taught right now and it is interview and interrogation. It is a process that starts with very open communication, very similar to interviewing [someone] for a job[,] to interrogation where you are now a little bit more confrontational, you are seeking the truth …."

The defense called Ramos's parents as witnesses. Alberto testified that he owned a gray van with Oregon license plates. He used it to move workers from one state to another. Ramos did not drive the van. Florencia testified that on July 25, 2011, she left the house at 5:30 a.m. When Florencia woke up, Ramos woke up also. She gave Ramos his medicine, and he stayed in bed. She called after 6:00 a.m. and talked to Ramos. He was still in bed. Asked how many vans the family owned, Florencia described six—two gray vans, two white vans, a van that was "sort of like an SUV," and another one. She testified that Ramos did not drive any of the family's vans. Ramos would drive her car, a Nissan Altima. She explained that he did not drive the vans "[b]ecause of his physical condition" and it was difficult for him to get up and down in a van.

The defense also called Deborah Davis as an expert witness on police interrogation techniques. She testified that interrogation techniques are highly developed

___

[9] CD's of the recordings and transcripts are part of the record on appeal.

and "based on what psychologists have studied for many years about how to influence people and get them to do what you want them to do." Davis described a study in which students were subjected to some of the interrogation techniques used by police and as many as half of the students falsely confessed to cheating. She explained that the two primary reasons people falsely confess are (1) "distress and tolerance," meaning a person confesses simply "to escape an adverse situation" and (2) the person becomes convinced that "the confession, even if it is false, will work to their best interest." She stated that false confessions are associated with longer interrogations.

On January 18, 2013, the jury found Ramos guilty of first degree murder and found true the special allegation that Ramos personally and intentionally discharged a firearm in the commission of the murder.

The trial court imposed a term of 25 years to life for the murder conviction plus a consecutive term of 25 years to life for the firearm enhancement under section 12022.53, subdivision (d).

## DISCUSSION

### I.  Invocation of Miranda rights

Ramos contends his statement to the police was inadmissible because it was obtained after his invocation of his *Miranda* rights.

#### A.  Background

About twenty minutes into the recorded interview, Zaragoza read Ramos his *Miranda* rights. Zaragoza and Ramos then had the following exchange:

"[Detective]: … do you understand what, what I read?

"[Ramos]:    Yes, yes, yes.  I understand.

"[Detective]:  Uh, and you can decide at any time to exercise these rights and not answer any questions or make any statements if you want, Mkay.

"[Ramos]:  Yeah, that's it.  Yeah.

"[Detective]: Understand? Okay. All right, you understanding everything I—I explained to you right? Okay…

"[Ramos]: … Yeah I understand, and I'm just gonna say that this is to where it's gonna get. You know what I mean?

"[Detective]: Mm-hmm.

"[Ramos]: Because I know where this is going, you know.

"[Detective]: Mm-hmm.

"[Ramos]: And—

"[Detective]: Okay, you wanna talk to me about this, about this case and all this? I'll put my pen away if you want.

"[Ramos]: About you know.

"[Detective]: 'Cause I'm here for you man—

"[Ramos]: Yeah, I understand.

"[Detective]: —so. Mkay. You wanna talk about the case?

"[Ramos]: No, I just wanna see—

"[Detective]: Okay…

"[Ramos]: … what's gonna go on, you know.

"[Detective]: I wanna tell you what's gonna, what's gonna happen…

"[Ramos]: … yeah, 'cause I—I…

"[Detective]: … you know because there's people over there … h—hold on Edward. Uh, uh, Elias?

"[Ramos]: Yes.

"[Detective]: All right. Your middle name's Albert?

8.

"[Ramos]:  Yes.

"[Detective]:  There's people out there, you know, I—I don't know what the heck's going on over … in Lindsay, Exeter, but they're making these crazy accusations, and—and I just wanna give you the time—

"[Ramos]:  Yeah, they're…

"[Detective]:  … you know to—to tell me what—what's going on, mkay.

"[Ramos]:  Yeah.

"[Detective]:  All right.  You—you wanna talk about that? …

"[Ramos]:  … (unintelligible) yeah, sure.

"[Detective]:  Okay.

"[Ramos]:  I'll talk about it.…"

At trial, defense counsel objected to the admission of the video recording of the interview, asserting that Ramos invoked his *Miranda* rights after they were read to him.  The objection was overruled.

### B.     Analysis

"The Fifth Amendment to the United States Constitution, which applies to the states by virtue of the Fourteenth Amendment, provides that no person may be compelled to be a witness against himself or herself.  [Citations.]  In *Miranda*, *supra*, 384 U.S. 436, the United States Supreme Court 'adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the "inherently compelling pressures" of custodial interrogation.'  [Citation.]  Pursuant to *Miranda,* a suspect 'must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'  [Citation.]"  (*People v. Linton* (2013) 56 Cal.4th 1146, 1170-1171.)

"It is well settled, however, that after the familiar *Miranda* advisements are given, a suspect can waive his or her constitutional rights. [Citation.] To establish a valid *Miranda* waiver, the prosecution bears the burden of establishing by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary under the totality of the circumstances of the interrogation." (*People v. Linton*, *supra*, 56 Cal.4th at p. 1171.)

"In reviewing *Miranda* issues on appeal, we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained. [Citations.]" (*People v. Smith* (2007) 40 Cal.4th 483, 502.)

Here, the transcript and video recording reflect that Ramos understood his rights and agreed to talk about the case. Zaragoza asked if he wanted to talk about it, and Ramos responded, "[Y]eah, sure. [¶] … [¶] I'll talk about it." He then did talk and answered Zaragoza's questions.

Ramos relies on the portion of the transcript which shows that, after being read his *Miranda* rights and asked if he wanted to talk about the case, he initially responded, "No, I just wanna see— [¶] … [¶] … what's gonna go on, you know." Ramos argues, "What the detective did [in response] cannot be described as anything but an attempt to avoid [Ramos] saying that he didn't want to talk; rather, he tried to convince [Ramos] that talking was in his [best] interest." We disagree.

Our Supreme Court "has recognized that 'when a suspect under interrogation makes an ambiguous statement that could be construed as an invocation of his or her *Miranda* rights, "the interrogators may *clarify* the suspect's comprehension of, and desire to invoke or waive, the *Miranda* rights."' [Citations.]" (*People v. Williams* (2010) 49 Cal.4th 405, 428.) Although "the question whether a waiver is knowing and voluntary is directed at an evaluation of the defendant's state of mind, the question of ambiguity in an asserted invocation must include a consideration of the communicative aspect of the

invocation—what would a *listener* understand to be the defendant's meaning." (*Ibid.*) The question of ambiguity is an objective inquiry. (*Ibid.*)

We have reviewed the video recording as well as the transcript, and we do not understand Ramos's response ("No, I just wanna see— [¶] … [¶] … what's gonna go on, you know") to have been an objectively unambiguous invocation of his right to remain silent. The statement reasonably could be understood as a question ("What's going to happen?") or a statement ("I want to know what is going to happen first") rather than a direct, negative response to Zaragoza's question. Indeed, Zaragoza appeared to have understood Ramos's statement as a question, which he tried to answer. ("I wanna tell you … what's gonna happen") Then Zaragoza asked again whether Ramos wanted to talk about the case. At that point, Ramos unequivocally responded, "yeah, sure" and proceeded to talk and answer Zaragoza's questions. Viewed in context, we conclude that it was reasonable for Zaragoza to clarify Ramos's initial response to the question whether Ramos wanted to talk about the case. Consequently, there was no *Miranda* violation.

## II.      *Voluntariness of Ramos's statement*

### A.      *Background*

In a pretrial motion, defense counsel argued that Ramos's interview should be excluded because "all statements made by Mr. Ramos were made as a consequence of threats and promises made to Mr. Ramos by law-enforcement." The motion did not identify any threats or promises allegedly made by law enforcement during the four and one-half hour interview. At a hearing on pretrial motions, the trial court noted that it was incumbent upon defense counsel to point out the specific alleged threats or promises to the court. The court stated that it was open to holding a hearing where defense counsel "can identify that spot or the spots upon which [Ramos was] specifically challenging the voluntariness of the statements." It does not appear from the record, however, that defense counsel filed anything requesting such a hearing or documenting any specific alleged incidents of threats or promises by the detectives who conducted the interview.

11.

After the trial started and the jury had viewed the video recording of the interview, the court raised its concerns about the police interview outside the presence of the jury. The court observed that it had denied Ramos's pretrial motion to exclude his statement to the police based on involuntariness. The court stated, however, "I have had an opportunity to read through that interview and I have got some real serious, very serious issues with it .…" The court explained, "[W]hat causes me the most concern is that clearly these interrogators have an answer they want out of Mr. Ramos and they have used every single technique that they are aware of to get the words to come out of his mouth .…" The court noted that it was focusing on the last part of the interview and "much if not most of the interrogation is not like that."

Finally, the court reaffirmed its previous ruling: "I am going to be consistent with my ruling to overrule the motion to have it suppressed. I do think the jury can take it for what [it's] worth.… The question of voluntary confession is a matter of law that I am required to rule on and I just did. But certainly the jury is well within their job to consider how much weight they give to any evidence given the totality of the circumstances and I am sure that is going to be argued by counsel."

### B.   Analysis

Both the state and federal Constitutions bar the admission of a defendant's involuntary statement at trial. (*People v. Duff* (2014) 58 Cal.4th 527, 551.) "'"A statement is involuntary if it is not the product of '"a rational intellect and free will."'" [Citation.] The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.'"' [Citation.] In assessing whether statements were the product of free will or coercion, we consider the totality of the circumstances, including "'"the crucial element of police coercion,"'" the length, location, and continuity of the interrogation, and the defendant's maturity, education, and physical and mental health. [Citation.]" (*Id.* at pp. 555-556.) "In assessing allegedly coercive police tactics, '[t]he courts have prohibited only those psychological ploys

12.

which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.' [Citation.]" (*People v. Smith*, *supra*, 40 Cal.4th at p. 501.)

As with *Miranda* issues, we review issues of voluntariness by accepting the trial court's resolution of disputed facts and inferences and independently determining from the undisputed facts and facts properly found by the trial court whether the challenged statement was illegally obtained. (*People v. Duff*, *supra*, 58 Cal.4th at p. 551.)

Ramos contends his interview statements were the product of an impermissibly coercive interrogation process. He argues the interview was unduly lengthy, the detectives suggested they were "'nice guys'" who were "'there for'" Ramos, and they implicitly promised him a benefit if he cooperated and a penalty if he did not. We have viewed the entire police interview and read the transcript, and we disagree.

The interview took place in a small room with a table. At the beginning of the interview, Ramos observed it was "[n]ice and cool" in the interview room. Ramos was 23 years old. He graduated from high school and attended junior college. He explained that he did not finish school because he became ill. He had Guillain Barre syndrome, which he described as attacking the immune system. He said he was "on meds, but everything's good." Throughout the interview, Ramos appeared to understand what was happening. Although Ramos notes on appeal that he is a Guillain Barre sufferer, he does not explain how that would have affected him during the interview. On the record before us, nothing about the location of the interview or Ramos's maturity, education, and physical and mental health demonstrates that his interview statements were not voluntary.

Nor did the detectives make promises or threaten Ramos. We observe that "mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. [Citation.]" (*People v. Jimenez* (1978) 21 Cal.3d 595, 611, abrogated by ballot initiative as recognized in *People v. Markham* (1989) 49 Cal.3d 63,

13.

65, and overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 509-510, fn. 17.) Here, about two hours into the interview, Ramos became upset and asked, "[I]f I tell you the truth, am I gonna do time?" Zaragoza told Ramos he did not know but "if you lie about stuff like this, it's only gonna go south." Ramos responded, "I know." At that point, Ramos admitted he had a shotgun with him when he went to pick up Acuna. He said the shotgun went off one time. Later, Zaragoza asked why Ramos had lied to him for over two hours. Ramos answered, "I felt remorse bro but I know the way you guys work man, you know …." Zaragoza said, "[W]e were cool with you right?" Ramos responded, "You guys are hell-a cool with me." Zaragoza asked, "Did anybody promise you anything?" Ramos responded, "No. I was just scared bro." Zaragoza's advice to Ramos that he tell the truth did not render Ramos's statements involuntary.

Ramos also suggests that Zaragoza threatened Ramos's brother during the interview. Zaragoza asked whether Jesus was involved, and Ramos was adamant that Jesus had nothing to do with it. In confirming that Jesus was not involved, Zaragoza said, "I don't have to harass him[?] I don't have to put handcuffs on him, nothing like that?" and Ramos said Jesus was innocent. Viewed in context, it does not appear that Zaragoza was threatening to harass Ramos's brother.

With respect to the length of the interview, a four and one-half hour interview is not necessarily coercive. The Attorney General points out that in *People v. Carrington* (2009) 47 Cal.4th 145, 175, questioning that continued over the course of eight hours was held not to have been coercive. In that case, "the interviewing officers chose to build rapport with [the] defendant and gain her trust in order to persuade her to tell the truth," and the defendant "appeared lucid and aware throughout the entire interrogation session and never asked the police officers to terminate the interview." (*Ibid.*) In the present case, the detectives similarly tried to build rapport with Ramos throughout most of the interview, and Ramos seemed lucid and aware throughout most of the interview.

14.

The detectives did appear to switch from interview mode to interrogation mode toward the end of the interview. The part of the interview the trial court was concerned about occurred during the last seven minutes of the recorded interview. The detectives began speaking loudly and in an accusatory manner as they asked Ramos why he had killed Acuna. By that point, however, Ramos had admitted that he shot Acuna and offered various implausible explanations for how and why it had happened.[10] Under the totality of the circumstances, we conclude the length of the interview did not render Ramos's statements involuntary.

Finally, we reject Ramos's claim that the trial court "'pass[ed] the buck'" to the jury to determine whether his statements were voluntary. The court recognized that the question of voluntariness was a matter of law it was required to decide and explicitly ruled that Ramos's statements were voluntary.

## III. *Acuna's prior felony conviction to impeach his hearsay statements*

### A. *Background*

At trial, defense counsel proffered evidence that Acuna was a convicted felon and a registered sex offender under section 290 to impeach Acuna's hearsay statements that Ramos shot him. The trial court indicated that a prior conviction could not impeach a dying declaration. Defense counsel explained that a conviction for a crime of moral turpitude is admissible to impeach a hearsay declarant. The trial court responded: "Yeah, but it has to be some kind of tie that connected [it] to testing the credibility of the statement[,] and if somebody is making a declaration certainly under the circumstances of what we heard I can't possibly think of what that person's criminal history may have to

---

**10** Ramos suggested Acuna tried to grab him and rape him. He said Acuna was in the Mexican Mafia and "he was supposed to shank me." Zaragoza asked if somebody asked him to shoot Acuna, and Ramos said someone "that sells a lot of drugs and stuff" asked him to do it. Ramos said people threatened his family. He said it had to do with corrupt police and medicinal marijuana club owners.

15.

do with the credibility of that statement." The court continued: "That is what I believe. And again it goes to the issue, it is not a hard and fast rule, it has to do with whether or not it relates to sustaining or [a]ffecting someone's credibility when you are admitting a statement that is not subject to cross-examination."

The court did not allow defense counsel to enter into evidence a judgment of Acuna's conviction for violation of section 288. In the cross-examination of Zaragoza, however, counsel was allowed to elicit testimony that Acuna had a "rap sheet" showing a criminal history. The jury heard additional references to Acuna's criminal past in the police interview. For example, at one point, Ramos said that Acuna told him he had been in prison for nine years and Ramos heard it was for rape. Later in the interview, Zaragoza asked Ramos if he took offense because he was "working with a child molester," meaning Acuna.

### B.      *Analysis*

A witness's credibility may be impeached by evidence of his or her prior felony convictions. (Evid. Code, § 788.) Under Evidence Code section 1202, "[a]ny … evidence offered to attack or support the credibility of [a hearsay] declarant is admissible if it would have been admissible had the declarant been a witness at the hearing." It follows then that a hearsay declarant's credibility may be attacked with evidence of his or her prior felony convictions. (See *People v. Jacobs* (2000) 78 Cal.App.4th 1444, 1450.)

On appeal, Ramos contends the trial court erred by excluding the prior felony conviction evidence offered to impeach Acuna. He further asserts the trial court "had no discretion to exclude the evidence."

Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Reviewing courts have recognized that the admission of prior convictions for impeachment purposes is

16.

subject to the trial court's discretion under Evidence Code section 352. (*People v. Little* (2012) 206 Cal.App.4th 1364, 1377; *People v. Robinson* (2011) 199 Cal.App.4th 707, 712; *People v. Jacobs*, *supra*, 78 Cal.App.4th at pp. 1452-1453.) Thus, contrary to Ramos's assertion, the trial court in this case did have discretion to exclude the proffered impeachment evidence.

The Attorney General argues that the trial court properly exercised its discretion under Evidence Code section 352 and implicitly found the probative value of Acuna's prior felony conviction for impeachment purposes was substantially outweighed by the danger of undue prejudice. Ramos replies that the trial court did not exclude Acuna's prior conviction as unduly prejudicial; rather, it incorrectly "thought felony convictions could only be admitted to impeach a hearsay declarant who was called as a witness."

We are not persuaded by Ramos's reply. In explaining its ruling, the trial court stated that the prior conviction did not appear to be relevant to impeach Acuna's hearsay statements given the circumstances under which they were made. The court noted, however, "it is not a hard and fast rule, it has to do with whether or not it relates to … credibility .…" The court's explanation indicates that it understood that it had discretion to admit Acuna's prior felony conviction, but did not find the conviction sufficiently probative of Acuna's credibility to outweigh the risk of prejudice or confusion of the issues. Assuming the trial court excluded the proffered impeachment evidence based on its authority under Evidence Code section 352, we see no abuse of discretion.

Further, even if we assume the trial court did err by excluding evidence of Acuna's conviction, we conclude the error was harmless under any standard. The evidence showed that after Acuna was shot, he began screaming that his boss's son shot him and indentified the shooter as "Elias" (and not Alberto's other son, Jesus). A neighbor heard a gunshot and then saw a van that belonged to Ramos's family speeding away from Ward's house. Ramos told detectives that he went to Acuna's house that morning, admitted that he had a shotgun, described where he hid the shotgun, and finally

17.

admitted that he shot Acuna. Although prior felony convictions are admissible to attack a hearsay declarant's credibility, under the circumstances presented, the fact that Acuna had a prior felony conviction was of extremely weak probative value to impeach his spontaneous statements to his roommate that Ramos had just shot him. Had the jury learned that Acuna had a prior conviction for violation of section 288, there is no reasonable possibility it would have reached a verdict more favorable to Ramos.

## IV.    *Jury instruction on alibi defense*

During a conference on jury instructions, defense counsel requested an instruction on alibis. Specifically, he submitted the following version of CALCRIM No. 3400: "The People must prove that the defendant committed murder. The defendant contends he did not commit this crime and that he was somewhere else when the crime was committed. The People must prove that the defendant was present and committed the crimes with which he is charged. The defendant does not need to prove he was elsewhere at the time of the crime. [¶] If you have a reasonable doubt about whether the defendant was present when the crime was committed, you must find him not guilty."

Defense counsel relied on Florencia's testimony that Ramos was still in bed when she left the house and that she called home and he was still there. The court stated that it did not believe there was evidence to support an alibi defense and did not give the instruction.

"A party is entitled to a requested instruction if it is supported by substantial evidence. [Citation.] Evidence is '[s]ubstantial' for this purpose if it is 'sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' [Citation.] At the same time, instructions *not* supported by substantial evidence should not be given. [Citation.]" (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1049-1050.)

18.

The Attorney General concedes there was sufficient evidence to warrant an alibi instruction but argues the error was harmless. We agree that any error in failing to instruct the jury on alibi defenses was harmless.

In *People v. Ratliff* (1986) 41 Cal.3d 675, 694, the court concluded that the refusal of the trial court to give an alibi instruction was harmless error because it was not reasonably probable that a result more favorable to the defendant would have been reached had an alibi instruction been given. The *Ratliff* court noted that the victim identified the defendant and there was additional circumstantial evidence of the defendant's guilt. (*Id*. at pp. 694-695.) Similarly, in this case, the victim identified Ramos as the shooter, his van was seen at Ward's house around the time of the shooting, and Ramos admitted that he went to Acuna's house, shot him, and hid the shotgun. In light of the evidence, it is not reasonably probable the jury would have reached a result more favorable to Ramos had it been instructed on alibi defenses.

## V.      *Enhancement under section 12022.53, subdivision (d)*

In the first amended information, it was alleged that Ramos "personally and intentionally discharged a firearm, a SHOTGUN, which proximately caused great bodily injury and death to [Acuna], within the meaning of Penal Code Section[] 12022.53[, subdivision ](d)."

The trial court instructed the jury on the intentional discharge of a firearm, CALCRIM No. 3148, but did not give an instruction on intentional discharge of a firearm *causing injury or death*, CALCRIM No. 3149. The jury was instructed: "If you find the defendant guilty of the crime charged in Count 1, you must then decide whether … the People have proved the additional allegation that the defendant personally and intentionally discharged a firearm during that offense.… [¶] To prove this allegation, the People must prove that: [¶] 1. The defendant personally discharged a firearm during the commission or attempted commission of the crime; [¶] AND [¶] 2. The defendant intended to discharge the firearm."

19.

The jury was not instructed on the third element required for an enhancement under section 12022.53, subdivision (d): "The defendant's act caused great bodily injury to, or the death of, a person who was not an accomplice to the crime." (CALCRIM No. 3149.)

The verdict form provided to the jury similarly omitted reference to causing great bodily injury or death. Thus, the jury found "TRUE the special allegation that as to Count 1 that in the commission of the above offense, that said DEFENDANT PERSONALLY AND INTENTIONALLY DISCHARGED A FIREARM, to wit: SHOTGUN, within the meaning of Penal Code section[] 12022.53[, subdivision ](d) .…"

Ramos argues that the sentence imposed for the firearm enhancement must be stricken because the jury was not instructed that it must find that the discharge of a firearm caused death or great bodily injury and "because [the jury] did not do so." The Attorney General responds that the instructional error is harmless because the jury could not have failed to conclude that Ramos intentionally discharged a firearm proximately causing death.

"Omission or removal of a single element from the jury is not … 'a structural defect in the trial mechanism that defies harmless error review and automatically requires reversal .…' [Citations.]" (*People v. Sakarias* (2000) 22 Cal.4th 596, 625.) "We may affirm the jury's verdicts despite the error if, but only if, it appears beyond a reasonable doubt that the error did not contribute to the particular verdict at issue. [Citations.] In particular, we may affirm despite the error if the jury that rendered the verdict at issue could not rationally have found the omitted element unproven; the error is harmless, that is, if the record contains no substantial evidence supporting a factual theory under which the elements submitted to the jury were proven but the omitted element was not. [Citation.]" (*Ibid.*)

Here, the jury found (1) that Ramos committed an act that caused the death of Acuna (as required to find him guilty of murder) and (2) that he personally discharged a

firearm during the commission of the murder (as required to find intentional discharge of a firearm as instructed). The evidence was undisputed that Acuna died from a single gunshot wound to the chest, and there was no evidence suggesting there was more than one shooter. Under these circumstances, the jury could not rationally have found the omitted element—that the discharge of the firearm by Ramos caused death—unproven. Accordingly, the instructional error was harmless beyond a reasonable doubt.

## VI. *Admission of Acuna's hearsay statements*

Ramos objected to the admission of the Acuna's hearsay statements at trial. The trial court overruled the objection, observing that the statements were "tantamount to a dying declaration" and a spontaneous declaration. Ward testified that Acuna repeatedly said his boss's son shot him and he identified the son as Elias. In the 911 recording played for the jury, a man's voice can be heard saying "Elias" when asked what Alberto's son's name was.

On appeal, Ramos continues to assert that the admission of Acuna's hearsay statements to prove the identity of the shooter violated his Sixth Amendment right to confront and cross-examine witnesses. In *Crawford*, *supra*, 541 U.S. at page 68, the United States Supreme Court held that, where a hearsay statement is "testimonial," the Sixth Amendment demands "what the common law required: unavailability and a prior opportunity for cross-examination" by the defendant for the hearsay statement to be admissible.

In *People v. Monterroso* (2004) 34 Cal.4th 743, 764 to 765 (*Monterroso*), the California Supreme Court held that the admission of dying declarations, whether testimonial or not, does not violate the Sixth Amendment because dying declarations were admissible at common law in felony cases even when the defendant was not present at the time the statement was taken. (Accord, *People v. D'Arcy* (2010) 48 Cal.4th 257, 290-291 (*D'Arcy*).)

21.

Ramos does not claim that *Monterroso* and *D'Arcy* are inapplicable; he argues only that they were wrongly decided.  He concedes, however, that we are bound by those cases.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Accordingly, in light of the controlling state court authority of *Monterroso* and *D'Arcy*, we reject Ramos's argument that admission of Acuna's hearsay statements violated his Sixth Amendment rights.

## ***DISPOSITION***

The judgment is affirmed.


_____

Kane, J.

WE CONCUR:


_____

Gomes, Acting P.J.


_____

Detjen, J.